## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel.** : | |
| **BRYAN ARVEY,** | |
| : | |
| **Plaintiffs,** | |
| : | |
| **v.** | **CIVIL NO. RDB-13-1554** |
| : | |
| **HART TO HEART** | |
| **TRANSPORTATION SERVICES, INC.,** : | |
| | |
| **EMS BILLING SOLUTIONS, INC.,** : | |
| | |
| **JOHN J. SKIDMORE** : | |
| **a/k/a JASON SKIDMORE,** | |
| : | |
| **TERRY SKIDMORE,** | |
| : | |
| **RICHARD C. SKIDMORE** | |
| **a/k/a CORY SKIDMORE,** : | |
| | |
| **Defendants.** : | |

...oOo...

## UNITED STATES OF AMERICA'S COMPLAINT IN INTERVENTION

COMES NOW Plaintiff, the United States of America, by and through counsel, and alleges as follows:

### I.  INTRODUCTION

1.  Defendant Hart to Heart Transportation Services, Inc. ("Hart to Heart") routinely and fraudulently provided ambulance transportation to patients who could sit, stand, or walk, or whose condition was otherwise such that ambulance transport was not medically necessary.

2.  Hart to Heart, through its billing arm EMS Billing Solutions, Inc. ("EMS"), submitted thousands of false claims to Medicare and received millions of dollars in payments for these false claims.

3.      Defendants John J. Skidmore, Terry Skidmore, and Richard C. Skidmore enforced this fraudulent behavior at all levels of Hart to Heart.  They trained, threatened, and coerced Emergency Medical Technicians ("EMTs"), other ambulance staff, and EMS billing employees to transport patients for whom ambulance transport was not medically necessary and to bill Medicare for those transports.  They demanded that their employees falsify records to make ambulance transportation appear medically necessary when it was not.  When employees did not comply, Hart to Heart or EMS altered transportation records, without EMT or ambulance staff consent, to falsify their justification for Medicare reimbursement.

4.      In filing this Complaint, the United States seeks statutory damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA"), and common law to recover Medicare payments attributable to this fraudulent scheme.

## II.     NATURE OF ACTION

5.      The United States of America brings this action to recover treble damages and civil penalties under the FCA and to recover damages and other monetary relief under common law or equitable theories of unjust enrichment or payment by mistake.

6.      The United States bases its claims on Hart to Heart presenting, making and using, and causing to be presented, made and used, false or fraudulent claims to Federal health care programs in violation of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

7.      Between at least 2010 and at least 2018 (the "Relevant Period"), Hart to Heart knowingly submitted or caused to be submitted thousands of false claims to Medicare, which resulted in Medicare reimbursement that would not have been paid but for Hart to Heart's misconduct.

### III.    JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345.

9.      This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants reside and transact business in the District of Maryland. Venue is proper in the District of Maryland under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c) because Defendants reside and transact business in this District.

### IV.    PARTIES

10.     The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS").  HHS is an agency and instrumentality of the United States.  Federal funds pay for its activities, operations, and contracts.  HHS has delegated the administration of the Medicare Program to its component agency, CMS.

11.     Relator Bryan Arvey ("Relator") worked as an ambulance driver for Hart to Heart from August 2010 until early 2013.  On May 29, 2013, Relator filed the instant *qui tam* action alleging violations of the FCA on behalf of himself and the United States pursuant to 31 U.S.C. § 3730(b)(1).

12.     Defendant Hart to Heart is incorporated in the State of Maryland and has its principal office at 355 Granary Road, Forest Hill, Maryland.  Hart to Heart is in the business of providing commercial ambulance, wheelchair van, and other healthcare-related transportation operation services.  At all times during the Relevant Period, Hart to Heart provided transportation services and participated in the Medicare program in the States of Maryland and Delaware.

13.     Defendant EMS is incorporated in the State of Maryland and has its principal office at 355 Granary Road, Forest Hill, Maryland.  EMS is in the business of managing, processing, and submitting medical transportation claims.  EMS processes claims for Medicare reimbursement on behalf of Hart to Heart, which is EMS's only client.

14.     Defendants John J. Skidmore, also known as Jason Skidmore ("Jason"), and Terry Skidmore are joint owners of Hart to Heart.  As such, these Defendants were responsible for development and implementation of operations, policy, and billing decisions and practices with respect to Hart to Heart's services.  They also had primary responsibility for obtaining and maintaining required documentation to substantiate the need for ambulance transport, and for deciding whether to bill Medicare for ambulance transportation services during the Relevant Period.

15.     Jason Skidmore and Terry Skidmore are married and together own four companies related to Hart to Heart:  EMS, Caring Hearts Ambulance Service ("Caring Hearts"), Statewide Automotive, and Skidmore Properties.

16.     Caring Hearts is a management company that employs the executive staff who direct the operation and management of both Hart to Heart and EMS.  Caring Hearts is incorporated in the State of Maryland and has its principal office at 355 Granary Road, Forest Hill, Maryland.

17.     Statewide Automotive is a trade name used by H to H Automotive, Inc., a business that repairs and maintains the vehicles owned by Hart to Heart to deliver transport services.  Statewide Automotive has been forfeited while H to H Automotive is incorporated in State of Maryland and has its principal office at 2827 Churchville Road, Churchville, Maryland.

18.     Skidmore Properties is a real estate entity that owns the buildings from which Hart to Heart, EMS, Caring Hearts, and Statewide Automotive operate.  These four companies pay rent to Skidmore Properties.

19.     Defendant Richard C. Skidmore, also known as Cory Skidmore ("Cory") is the Vice President of Operations and Safety at Hart to Heart.  In this capacity, he managed and implemented Hart to Heart's operations, policy, and billing decisions, and disciplined and terminated employees during the Relevant Period.  He and Jason Skidmore are brothers.

## V.      THE MEDICARE PROGRAM

20.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, establishing the Health Insurance for Aged and Disabled Program.  This program is popularly known as Medicare.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease ("ESRD").  *See* 42 U.S.C. §§ 426, 426A.

21.     Part A, which is not at issue in this case, provides hospitalization insurance for eligible individuals.  42 U.S.C. § 1395c--1395i-5.  Part B, which is at issue in this case, is a voluntary subscription program of supplementary medical insurance.  42 U.S.C. § 1395k(a)(2)(B).  An enrolled individual is called a "beneficiary" or "bene."  A beneficiary who receives a covered medical service can either pay for the service and request reimbursement of 80% of the reasonable charge, or assign the right to reimbursement to the provider rendering the service, who collects as an assignee of the beneficiary under 42 U.S.C. § 1395u(b)(3)(B)(ii).

22.     All Medicare reimbursement for ambulance transports are subject to Medicare Part B, which includes ambulance transport in the definition of "medical and other health services." *See* 42 C.F.R. § 410.10(i).

23.     At all times during the Relevant Period, CMS contracted with private contractors (i.e. fiscal intermediaries, carriers and Medicare Administrative Contractors ("MACs")) to act as agents in reviewing and paying Medicare claims submitted by healthcare providers.  *See* 42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100.  At all relevant times, Novitas Solutions, Inc. ("Novitas"), or its predecessor Highmark Medicare Services, administered the Medicare Part B program in the State of Maryland.

24.     Medicare Part B does not cover services that are "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]"  42 U.S.C. § 1395y(a)(1)(A).

25.     Providers participating in Medicare are legally prohibited from making false statements or misrepresentations of material facts concerning payment requests.  *See* 42 C.F.R. §§ 1320a-7b(a)(1)(2), 413.24(f)(4)(iv), 1001.101(a)(1); 42 U.S.C. § 1320a-7b(a)(1)(2).  Providers also agree to abide by all Medicare laws, regulations, and program instructions that apply to the providers.  Providers stipulate that Medicare payments are conditioned upon the claim and the underlying transaction complying with the applicable laws, regulations, and program instructions.

26.     To participate in the Medicare program, all health care providers, including ambulance companies, must enter into agreements with CMS in which the providers agree to conform to all applicable statutory and regulatory requirements for Medicare reimbursement.  The Medicare Enrollment Application, a form also known as the CMS-855B, explains the civil and criminal penalties for falsifying information relating to Medicare participation.  The penalties include criminal prosecution under 18 U.S.C. §§ 1001 and 1035 for false statements and 18 U.S.C. § 1037 for health care fraud.  Civil penalties include liability under the False Claims Act and under

the Social Security Act, 42 U.S.C. § 1320a–7a, for the knowing submission of a false or fraudulent

claim to the United States, or making or using a false record or statement to get a claim paid.

27.     The provider's authorized official who signs the CMS-855B commits "the

organization to fully abide by the statutes, regulations, and program instructions of the Medicare

program" and certifies the provider's understanding of their legal obligations prohibiting the

submission of false claims:

> I have read and understand the Penalties for Falsifying Information, as printed in this
> application.  I understand that any deliberate omission, misrepresentation, or falsification
> of any information contained in this application or contained in any communication
> supplying information to Medicare, or any deliberate alteration of any text on this
> application form, may be punished by criminal, civil, or administrative penalties including,
> but not limited to the denial or revocation of Medicare billing privileges, and/or the
> imposition of fines, civil damages, and/or imprisonment.
>
> I agree to abide by the Medicare laws, regulations and program instructions that apply to
> this supplier.  The Medicare laws, regulations, and program instructions are available
> through the Medicare contractor.  I understand that payment of a claim by Medicare is
> conditioned upon the claim and the underlying transaction complying with such laws,
> regulations, and program instructions (including, but not limited to, the Federal anti-
> kickback statute and the Stark law), and on the supplier's compliance with all applicable
> conditions of participation in Medicare.
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for
> payment by Medicare, and I will not submit claims with deliberate ignorance or reckless
> disregard of their truth or falsity.

28.     Jason Skidmore signed the CMS-855B as the President/CEO of Hart to Heart.

29.     The prohibition against false statements or misrepresentations of material facts

concerning the claim submissions, compliance with all applicable Medicare laws, regulations, and

program instructions, and the provider's stipulation that the claims and the underlying transactions

comply with the applicable laws, regulations, and program instructions are material to Medicare's

payment of claims.

30.     To obtain Medicare reimbursement pursuant to Part B, providers submit claims, usually electronically, using forms known as CMS 1500s.  The provider includes certain five-digit codes on a CMS 1500 that are known as the Healthcare Common Procedure Coding System ("HCPCS") codes.  These HCPCS codes identify the services rendered for which reimbursement is sought.

31.     Any provider seeking Medicare reimbursement through Part B must certify on a CMS 1500 that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision."

32.     The provider's certifications that the services claimed were medically indicated and necessary for the health of the patient, and that the claims submitted were accurate, complete and truthful are material to Medicare's payment of the claim.

## VI.     MEDICARE REIMBURSEMENT FOR AMBULANCE TRANSPORTS

33.     Medicare only covers ambulance transport services "where the use of other methods of transportation is contraindicated by the individual's condition, but only to the extent provided in regulations."  42 U.S.C. § 1395x(s)(7).  Under the regulations, Medicare pays for ambulance services "only if they are furnished to a beneficiary whose medical condition is such that other means of transportation are contraindicated."  42 C.F.R. § 410.40(d)(1).

34.     Medicare does not reimburse transportation by wheelchair van, taxicab, or means other than ambulance.  Neither does Medicare Part B pay for ambulance transport for all types of medical services.  For example, transports to and from a hospital, skilled nursing facility, and patient's home may be covered, but generally Medicare Part B does not pay for ambulance

transportation to a physician's or therapist's office, nor for other outpatient services depending on the location and nature of the services.

35.     The Medicare Benefit Policy Manual, which sets forth the rules and regulations for Medicare reimbursement, further describes the requirements for coverage of ambulance transport. The Manual describes the importance of medical necessity as follows:

> Medical necessity is established when the patient's condition is such that use of any other method of transportation is contraindicated.   In any case in which some means of transportation other than an ambulance could be utilized without endangering the individual's health, whether or not such transportation is actually available, no payment may be made for ambulance services.

Medicare Benefits Policy Manual at Chapter 10, Section 10.2.1.  In other words, if a patient's health will not be compromised by other means of travel, then Medicare will not pay for ambulance transport.

36.     Ground ambulance transportation is provided at different levels of service depending on the patient's medical condition.  The levels include the following:  Advanced Life Support Level 1 ("ALS1"), which includes emergency and non-emergency; ALS Level 2; Specialty Care Transport ("SCT"); Basic Life Support ("BLS"), which includes emergency and non-emergency; and Paramedic ALS Intercept ("PI").  42 C.F.R. § 410.40(b).  Patients who require ALS and SCT require higher levels of medical care during transport than patients who require BLS.

37.     Medicare reimbursement rates depend on the level of service provided.  Medicare also compensates for the mileage associated with each ambulance transport.  42 C.F.R. § 414.610.

38.     Ambulance companies may only submit claims to Medicare for the level of service that is medically necessary.

39.     Non-emergency transportation by ambulance is appropriate if either of the following is true:  the beneficiary is bed-confined and the beneficiary's documented condition at the time of transport is such that other methods of transportation are contraindicated; or if the beneficiary's medical condition, regardless of bed-confinement, is such that transportation by ambulance is medically required.  42 C.F.R. § 410.40(d)(1).  While bed-confinement is one factor in assessing the medical necessity of non-emergency ambulance transports, it is not the sole criteria for such determinations.  *Id.*

40.     To be considered bed-confined, the patient must meet all three of the following criteria:  (a) be unable to get up from bed without assistance; (b) be unable to ambulate; and (c) be unable to sit in a chair or wheelchair.  42 C.F.R. § 410.40(d)(1)(i)-(iii).  In other words, the patient must be unable to sit, stand, or walk.

41.     A special rule exists for non-emergency, scheduled, repetitive ambulance transports.  These ambulance services include scheduled, repetitive transports for dialysis, an area that HHS has recognized as particularly susceptible to fraud.  Indeed, the Office of the Inspector General ("OIG") for HHS has found that "the ongoing and repetitive nature of dialysis treatment makes transports to and from such treatment vulnerable to abuse."  *See* Office of Inspector General, Medicare Payments for Ambulance Transports, OEI-05-02-00590, January 2006.   Not surprisingly, in a prior study of the matter, HHS-OIG found that "many dialysis transports do not meet coverage criteria."  *Id.*

42.     Ambulance providers seeking reimbursement for non-emergency, scheduled, repetitive ambulance transports, including those to and from dialysis centers, must obtain a written order known as a Physician's Certification Statement ("PCS") from the beneficiary's attending physician certifying that the medical necessity requirements have been met.  42 C.F.R.

§ 410.40(d)(2)(i).  The physician's PCS must be dated no earlier than 60 days before the date of service is furnished.  *Id.*

43.     Medicare covers medically necessary, non-emergency ambulance services that are either unscheduled or scheduled on a non-repetitive basis if the ambulance provider obtains a PCS from the beneficiary's physician within 48 hours after the transport.  42 C.F.R. § 410.40(d)(3)(i). The certification may also be signed by a physician assistant, nurse practitioner, clinical nurse specialist, registered nurse, or discharge planner "who has personal knowledge of the beneficiary's condition at the time the ambulance transport is ordered or the service is furnished" and is employed by the physician, hospital, or facility.  42 C.F.R. § 410.40(d)(3)(iii).

44.     If the ambulance provider is unable to obtain the required PCS within 21 calendar days following the date of service, then the ambulance supplier must document its attempts to obtain the PCS and may then submit the claim.  Acceptable documentation includes evidence that the ambulance supplier attempted to obtain the required certification from the patient's attending physician or other medical personnel with "personal knowledge of the beneficiary's condition at the time the ambulance transport is ordered or the [transport] is furnished."   42 C.F.R. § 410.40(d)(3)(iv).

45.     A signed PCS alone does not demonstrate that any type of ambulance transport, including non-emergency, is reasonable and necessary.  Rather, the transport must meet all other program criteria, including medical necessity, in order for payment to be claimed and made.  42 C.F.R. §§ 410.40(d)(2)(ii), 410.40(d)(3)(v).

46.     Medicare rules require ambulance suppliers to retain documentation as to the relevant aspects of the transport, including the dispatch instructions, the patient's condition, other on-scene information, and details regarding the transport itself.  Ambulance suppliers must keep

these documents on file and make them available for MAC review upon request.   42 C.F.R.

§§ 410.40(d)(2)(ii), 410.40(d)(3)(v).

47.     The Medicare Benefits Policy Manual describes the documentation needed to

support medical necessity, which providers must keep on file:

> In all cases, the appropriate documentation must be kept on file and, upon request, presented to the Medicare Administrative Contractor (MAC).  It is important to note that the presence (or absence) of a physician's order for a transport by ambulance does not necessarily prove (or disprove) whether the transport was medically necessary.  The ambulance service must meet all program coverage criteria for payment to be made.

Medicare Benefits Policy Manual at Chapter 10, Section 10.2.1.

## VII.    THE FALSE CLAIMS ACT

48.     The FCA provides, in pertinent part, that any person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> *  *  *
>
> is liable to the United States Government for a civil penalty of not less than $[5,500 or 10,957] and not more than $[11,000 or 21,916], ... plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .

31 U.S.C. § 3729.

49.     For purposes of the FCA, the terms "knowing" and "knowingly" mean that a

person:  (1) has actual knowledge of the information in question; (2) acts in deliberate ignorance

of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of

the information.  31 U.S.C. § 3729(b)(1).

50.     "Congress added the 'reckless disregard' provision to the FCA in 1986 in order to

ensure that 'knowingly' captured the 'ostrich' type situation whe[re] an individual has 'buried his

head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017) (quoting S. Rep. No. 345, 99th Cong., 2d Sess. 17, 21 (1986), reprinted in 1986 U.S.C.C.A.N. 5266). *See also*, *U.S. v. Rachel*, 289 F. Supp. 2d 688, 698 (D. Md. 2003) (quoting same language).

## VIII.   HART TO HEART'S FRAUDULENT CONDUCT

51.     Beginning in at least 2010 and continuing until at least 2018, Hart to Heart, with actual knowledge, reckless disregard, or deliberate ignorance, provided Medicare beneficiaries with BLS non-emergency ambulance transportation services that were not medically necessary and then billed Medicare for the transports.  Despite Medicare's requirement that patients be transported by ambulance only when every other means of transport is contraindicated, Hart to Heart routinely provided BLS non-emergency ambulance transports to patients who could have travelled by other means without compromise to their health.

52.     Crewmembers documented their transportation of patients in a document known as a Patient Care Report ("PCR"), also referred to as "trip report," "trip sheet,"  "run report," or "run sheet."  These PCRs contained details about a patient's condition at the time of transport based on crew observations.

53.     Numerous former crewmembers, managers, and billers with Hart to Heart, EMS, and Caring Hearts consistently recounted to Government investigators Hart to Heart's transportation of wheelchair-bound or ambulatory patients by ambulance, falsification of PCRs, and submission of false claims for Medicare reimbursement.

A. **Hart to Heart's Forced Transportation of Ambulatory or Wheelchair-Bound Patients by Ambulance**

54.     One of the most consistent narratives among former crewmembers was Hart to Heart's repeated transportation of ambulatory or wheelchair-bound patients by ambulance even though the patients could have traveled in a wheelchair van or alternate mode of transport. Transport locations included hospitals, physicians' offices, and dialysis, rehabilitation, and wound care centers.

55.     A former Hart to Heart manager described the company's transit philosophy as "you call, we haul, that's all."

56.     Crewmembers estimated that between twenty and fifty percent of patients they transported by ambulance could have used another means of transport, making ambulance transport medically unnecessary for those patients.

57.     Crewmembers regularly found ambulance transport patients sitting in chairs or standing upon their arrival.  Ambulance transportation is rarely necessary for a patient who is able to sit, stand, or walk.

58.     Hart to Heart's policy required crewmembers to call Hart to Heart dispatch if upon arrival they encountered a patient sitting or standing.  No crewmember could recall dispatch ever ending the ambulance and arranging for transport by wheelchair van or other means.  Patients found sitting, standing, or walking were nonetheless transported by ambulance, even when they were stable, alert, and oriented.

59.     One crewmember recalled dispatch regularly claiming that no wheelchair vans were available and to transport the patient by ambulance.

60.     Another crewmember transported a patient with a broken ankle by ambulance who could have been transported by wheelchair van.

14

61.     On occasion, Hart to Heart lacked the crew needed to complete scheduled ambulance transports.   In those situations, Hart to Heart would sometimes engage another ambulance transportation company to cover its shortfall.   Hart to Heart called this process "vending."

62.     This vending process is another window into Hart to Heart's fraudulent transport of ambulatory BLS patients.

63.     Hart to Heart transported a patient named C.C. thirteen times from hospitals between April of 2014 and April of 2016, billing Medicare and receiving reimbursement for each transport.   Hart to Heart vended out one of C.C's transports in February of 2016 to another ambulance company called Lifestar Response Corporation ("Lifestar").   LifeStar transported the patient by ambulance but refused to bill Medicare and instead sent Hart to Heart a bill, explaining, "[patient] is ambulatory, billing H2H."   "H2H" is Hart to Heart.

64.     To continue its practice of billing Medicare for ambulance transport of ambulatory patients, a former Hart to Heart data specialist determined when to vend out a patient's transport based on her training by management.   She did not vend repetitive, scheduled patients transported to dialysis appointments.   As discussed in Section IX.A below, Hart to Heart transported a high rate of ambulatory dialysis patients by ambulance.

65.     Another crewmember specifically remembered two nursing home patients, G.G. and R.F., who were wheelchair-bound but transported to dialysis by BLS ambulance instead of a wheelchair van.   This crewmember estimated that "a good ninety percent" of dialysis patients were ambulatory or were able to stand and pivot such that ambulance transportation was not medically necessary.

66.    According to some crewmembers, management told EMTs to transport patients by ambulance or be fired.

**B.    Hart to Heart's Multi-Faceted Approach to Falsifying PCRs**

67.    Not only did Hart to Heart's dispatchers instruct former crewmembers to transport patients who could sit, stand, or walk by ambulance, but Hart to Heart's policies also required crewmembers to take steps to create false and misleading documentation relating to the patients' abilities to sit, stand, or walk.

68.    Hart to Heart's policies required crewmembers to leave the room upon seeing a patient sitting, standing, or walking.  Crewmembers were then required to ask facility staff to situate the patients so that they were lying in bed.  After that, crewmembers would return to the room to "find" the patient lying in bed.  Hart to Heart expected crewmembers to include only this second "finding" in their PCRs.

69.    A crewmember recalled an email from Cory requiring ambulatory or seated nursing home patients to be placed in bed before being put on a stretcher.  Cory's email also instructed EMTs to indicate on their PCRs that they found the patient in bed and that the patient was unable to sit, stand, or walk.

70.    Cory told EMTs not to allow a patient to demonstrate the ability to move from the bed, but to document a two-person lift and maximum assistance instead, even when such a lift or assistance did not occur or was not medically necessary.

71.    Hart to Heart management instructed a former EMT to omit from the PCR that a patient walked to the stretcher and instead to write that the crew transferred the patient to the stretcher.

72.    According to a former Hart to Heart manager, management and EMS billers regularly told crewmembers to use "certain buzz words" in their PCRs to "paint the picture" and

make Medicare reimbursement more likely.  These buzzwords included "assist to stretcher," "fall risk," "unable to walk," and "patient needed maximum assistance."

73.     Hart to Heart management used technology to pressure EMTs into changing the PCRs.

74.     Hart to Heart's computer software system could disseminate a message called a "punch-clock memo."  Ambulance crew would need to read and acknowledge the memo using their employee number, the last four digits of their SSN, before they could clock in for their shift.

75.     Cory created punch-clock memos to pressure EMTs into changing PCRs when the reports' original language made Medicare reimbursement less likely.  He also directed other management to create these memos on his behalf.

76.     One punch-clock memo near the end of 2015 prohibited crewmembers from allowing stretcher patients to walk or attempt to walk.  Crewmembers transporting such patients were forbidden from allowing the patient to walk or attempt to walk, and directed to stop the patient from walking and not record that the patient was ambulatory in their PCRs.

77.     Cory sent targeted punch-clock memos to crewmembers who wrote, "stand and pivot" in a PCR, contrary to management instructions not to use the phrase.

78.     If a punch-clock memo failed to change an employee's behavior, according to Hart to Heart's former Human Relations manager, then the employee would receive verbal warnings and face suspension or termination.

79.     Company policy required a former Field Operations Manager to reprimand employees whose PCRs did not include the buzzwords, "could not sit, stand, or walk," regardless of the patient's actual medical condition.

80.     Management directed EMTs not to document that a patient stood, pivoted, or walked.  EMS biller Debbie McCurley would become upset if an EMT included the word "walk" in a PCR.

81.     PCRs were returned to EMTs for revision if their reports indicated that crew found a patient sitting in a chair.

82.     Management instructed billers reviewing PCRs to report any crewmember who documented assisting a patient out of bed instead of using a board to transfer the patient to the stretcher.  Management would then counsel or discipline the crewmember on the importance of transporting patients without allowing them to demonstrate their ability to sit or stand.

83.     Hart to Heart developed a monetary bonus program in approximately the fall of 2013 that continued through at least the fall of 2017.

84.     Employees who refused to alter PCRs as demanded by management or billing would be disqualified from Hart to Heart's monetary bonus program.

**C.     When EMTs Refused to Falsify PCRs, EMS Billing Would Alter the Records**

85.     Management or billing staff directed former employees to revise their entries on PCRs to support Medicare reimbursement.  Some employees were disciplined, fired, or quit when they refused to make false entries on the PCRs.

86.     A former Hart to Heart manager noted that when crewmembers refused to change their PCR entries, the PCRs would be sent to Jason and Cory for further evaluation.  In those cases, crewmembers would "get a tongue lashing" from management.  Managers would threaten crews that "you keep writing this and we won't be paid."

87.     According to one former Hart to Heart Human Relations manager, Cory was a "hot head" who would "fire everyone if he could."  Cory wanted employees suspended or fired if they

submitted an "incomplete PCR," which included paperwork without the information the billing department needed to bill the claim to insurance.

88.     Management and billing personnel could access PCR narratives entered by the ambulance crew to falsify documentation when crewmembers refused to do so, including the representation that ambulatory patients were non-ambulatory.

89.     A former Director of Operations at Hart to Heart learned that billing staff were changing transport documentation to indicate that patients were bed-confined when they were not. This individual heard complaints from multiple EMTs who refused to change their PCRs after submitting them.

90.     According to an EMS biller, Debbie McCurley called hospitals to "interrogate" nurses regarding whether a patient who could sit, stand, or walk was actually bed confined or a fall risk.  She would "guilt" the nurses into agreeing with these characterizations by threatening to bill the ambulance transport to the patient's family.

91.     Hart to Heart gave billing staff lists of diagnosis codes that Medicare would accept and diagnosis codes that Medicare would deny.

92.     Billing staff used this information to falsify claims for reimbursement and increase the likelihood that Medicare would pay a claim.

93.     Where a patient's documentation did not specify a billable diagnosis code, managers instructed EMS billers to pick catchall diagnosis codes payable by Medicare, however thinly supported in a patient's documentation.  For example, a former EMS billing clerk often selected the diagnosis code for "fall risk" if a patient used a wheelchair or walker.  EMS would then bill these claims to Medicare and, if denied, the claims would be "worked on the appeal end."

94.     When a PCR did not match a code on the list of about 10 billable codes, EMS supervisor Kelly Spangler would finish the billing process.  Kelly Spangler is Terry Skidmore's sister and Jason's sister-in-law.

95.     A billing clerk reported to Government investigators that between the PCR, PCS, and the discharge facility's transfer request ("face sheet"), billers would "always find something to bill."

96.     Billers were required to process 110 to 120 claims for payment per day, or one claim every four minutes.  Kelly Spangler and Chief Financial Officer Jeff Tucker told one billing clerk that she needed to bill faster.  EMS fired this employee when she could not bill more than 70 to 80 claims per day.

## IX.     HART TO HEART'S SUBMISSION OF FALSE CLAIMS

97.     From 2010 through 2017, Medicare paid Hart to Heart $42.3 million for ambulance transport services, including mileage.  Of that amount, Medicare paid $32.9 million for BLS non-emergency transport, including mileage.

98.     A review of claim samples revealed a high rate of false claims submitted by EMS on behalf of Hart to Heart, and paid by Medicare, for ambulance transports that were not medically necessary.  The following paragraphs summarize the various samples of claims reviewed and the incidence of false claims identified in those samples.

### A.     Non-Emergent, Repetitive, Scheduled Dialysis Transports

99.     From 2010 through 2017, of the $32.9 million Medicare paid Hart to Heart for BLS non-emergency transports, Medicare paid $4.4 million for ambulance transport to dialysis, including mileage.  Total payments ranged from a high of $942,012 in 2012, or 21% of all 2012 BLS transports, to a low of $9,215, or .31% of all BLS transports, in 2017.

100.    This precipitous drop occurred after CMS implemented a Prior Authorization Model for non-emergency, repetitive, scheduled ambulance transports and it reflects the degree to which Hart to Heart fraudulently transported ambulatory dialysis patients.

101.    The Prior Authorization process for non-emergency, repetitive, scheduled ambulance transports became effective January 1, 2016 in Maryland, Delaware, North Carolina, Virginia, West Virginia, and the District of Columbia.  To qualify for Medicare reimbursement, an ambulance provider was required to submit patient information, a clinician's PCS ordering the ambulance transport, and medical documentation in support of medical necessity.  Prior Authorization did not create a new process.  Rather it required the same information necessary to support Medicare payment earlier in the process so that the MAC could review and approve documentation supporting medical necessity in advance.  Without Prior Authorization obtained in advance, the MAC would stop paying claims after the third roundtrip and thereafter would perform pre-payment review of ambulance claims for medical necessity.

102.    After Prior Authorization took effect, Hart to Heart's non-emergency, repetitive, scheduled ambulance transports for dialysis plummeted, represented in the table below:

| BLS dialysis transports with prorated mileage | | | |
|---|---|---|---|
| | # Allowed Claims | Amount Paid Provider | % of Total BLS paid |
| 2010 | 2,184 | $445,349.53 | 13.39% |
| 2011 | 4,086 | $842,008.93 | 20.16% |
| 2012 | 4,392 | $942,011.91 | 20.84% |
| 2013 | 3,742 | $779,907.69 | 18.22% |
| 2014 | 3,477 | $680,452.75 | 15.07% |
| 2015 | 3,066 | $612,059.08 | 12.33% |
| 2016 | 521 | $103,234.57 | 2.47% |
| 2017 | 47 | $9,214.25 | 0.31% |
| | 21,515 | $4,414,238.72 | 13.40% |

103.     The graph below illustrates the steep drop in BLS dialysis transports after Prior Authorization took effect.



104.     An analysis of claims data shows numerous examples of false and fraudulent claims for BLS ambulance transports to and from dialysis facilities.

105.     Medicare paid Hart to Heart $32,393.89 for 171 trips to and from dialysis for patient M.G. between December 5, 2013 and October 11, 2014.  As of December 31, 2013, Hart to Heart had already completed eleven transports to dialysis for M.G.  On that day, Debbie McCurley sent EMS supervisor Kelly Spangler an email reporting, "Jason first said he did not want to transport because he has gone by w/c [wheelchair] for months while in a facility."  Indeed, M.G's PCRs up to that point repeatedly described EMTs finding M.G. in a wheelchair.

106.     Despite McCurley's email, Hart to Heart billed Medicare for M.G's eleven ambulance transports to that date and Medicare paid all of those claims.  Thereafter, Hart to Heart continued to transport M.G. by ambulance and bill Medicare even after McCurley's December 31, 2013 email acknowledging his wheelchair status.  In total, Medicare paid Hart to Heart $32,393.89 for 171 BLS ambulance transports to and from dialysis for M.G. between December 5, 2013 and October 11, 2014.

107.     No other ambulance provider transported M.G. to or from dialysis after October 11, 2014, even though thereafter M.G. received 618 dialysis treatments without ambulance transport through September 29, 2018.  M.G's home is equipped with a wheelchair ramp and a stair chair leading to the second floor apartment.  M.G. continues to use a wheelchair as of November 2018.

108.     Medicare paid Hart to Heart $17,423.93 for 100 trips to and from dialysis for patient J.J. between August 17, 2015 and February 6, 2016.  On January 4, 2016, McCurley sent an email acknowledging that J.J. was a wheelchair patient.  Despite this actual knowledge, Hart to Heart still submitted bills to Medicare for J.J.'s transport during the weeks before, and Medicare paid those claims.  Between January 1 and February 6, 2016, Hart to Heart submitted claims to Medicare for J.J.'s ambulance transports with the code "GY," which indicates that the transport does not meet the definition of any Medicare benefit.  The GY modifier has the effect of seeking a denial of payment in order to submit the claim to a supplemental insurance program.  Medicare did not pay the GY claims.  After Hart to Heart's last ambulance transport of J.J. for dialysis, she received 104 dialysis treatments without ambulance transport until a few weeks before her death on November 26, 2016.

109.     Medicare paid Hart to Heart $84,484.44 for 419 trips to and from dialysis for patient M.H. between October 18, 2012 and December 30, 2015.  Hart to Heart stopped transporting M.H. after Prior Authorization took effect in 2016.  Neither Hart to Heart nor any other ambulance service took M.H. to dialysis after 2015, yet M.H. received 397 dialysis treatments without ambulance transports until September 29, 2018.

110.     Medicare paid Hart to Heart $21,783.88 for 128 trips to and from dialysis for patient M.J. between July 20, 2013 and March 13, 2014.  Neither Hart to Heart nor any other ambulance provider transported M.J. to or from dialysis after March 13, 2014, but M.J. received 704 dialysis

treatments between March 15, 2014 and September 28, 2018 without ambulance transport. Government investigators observed M.J. using a roll-a-tor, which is a type of walker, as of December 2016 to ambulate.  M.J. reported previously using a wheelchair.

111.    Medicare paid Hart to Heart $26,294.61 for 134 trips to and from dialysis between July 14, 2015 and December 31, 2015 for patient R.S.  Neither Hart to Heart nor any other ambulance provider transported R.S. to or from dialysis after Prior Authorization took effect on January 1, 2016, but R.S. received 388 dialysis treatments between January 3, 2016 and September 21, 2018 without ambulance transport.  R.S.'s caretaker reported transporting R.S. to and from dialysis in a car.  The caretaker also stated that R.S. has used a roll-a-tor to assist in walking for the last several years and prior to that R.S. was walking without assistance.

112.    Medicare paid Hart to Heart $18,691.80 for 106 trips to and from dialysis for patient R.C. between August 14, 2014 and December 31, 2014.  No other ambulance provider transported R.C. to or from dialysis thereafter, but R.C. received 553 dialysis treatments without ambulance transport until September 29, 2018.

113.    Medicare paid Hart to Heart $41,557.40 for 210 trips to and from dialysis for patient M.W. between November 17, 2012 and July 23, 2013.  Other ambulance providers transported M.W. to and from dialysis twice in August of 2013.  Thereafter, M.W. received 784 dialysis treatments without ambulance transport until two weeks before her death on September 7, 2018.

114.    Medicare paid Hart to Heart $50,914.26 for 196 trips to and from dialysis for R.W. between November 8, 2012 and June 22, 2013.  Neither Hart to Heart nor any other ambulance provider transported R.W. to or from dialysis after June 22, 2013, but R.W. received 445 dialysis treatments without ambulance transport between 6/25/2013 and her death on 7/16/2016.

**B.      Claims Reviewed by Kelly Spangler Years After Medicare Payment**

115.      While the government's investigation was ongoing, Hart to Heart's CFO Jeff Tucker and Jason Skidmore directed Kelly Spangler and Debbie McCurley to review hundreds of ambulance transports with transportation dates, or dates of service ("DOS") between 2010 and 2015 to "look up the reason for billing Medicare or . . . what the reason for the stretcher transport was." Hart to Heart and EMS had submitted these claims to, and been paid by, Medicare years before.

116.      The government's reviewer examined Hart to Heart's PCRs for 45 of the 222 claims that Kelly Spangler reviewed in August of 2017. Of these 45 BLS non-emergency transports between May 3, 2011 and July 26, 2012, the review indicated that approximately 55% of the transports were not medically necessary.

117.      The chart below contains examples of these false claims submitted for ambulance transports that were not medically necessary, including Kelly Spangler's explanation of the reasons for billing Medicare. Spangler's own explanations show that Hart to Heart submitted claims to Medicare for patients who could travel in a wheelchair, and whom crew found standing or sitting upon arrival. Examples of these fraudulent claims are below:

| Bene Initials | DOS | PAID | Hart to Heart Claim Diagnosis | Spangler Explanation for Medicare or Other Dispensation[1] |
|---|---|---|---|---|
| L.G.B. | 5/6/11 | $173.01 | BED CONFINEMENT STATUS | dialysis pt crew document pt in wheelchair at nursing home billed bed confined, esrd, fx hip |
| E.D. | 5/8/12 | $220.63 | FRACTURE OF UNSPECIFIED PART OF NECK OF FEMUR CLOSED | crew documented pt found standing in room with walker assisted to stretcher at residence assi[s]ted to chair by crew billed : fx hip, debbie billed with out no pcs no request from her to get one. |
| I.L.F. | 5/17/11 | $324.48 | BED CONFINEMENT STATUS | dialysis pt crew document transferred pt to chair at residence billed bed confined, esrd, 02 dependent |

---

[1] The abbreviations used in this column not previously defined include: esrd (End Stage Renal Disease, requiring dialysis); c2c (chair to chair); chf (congestive heart failure); fx (fracture); O2 (oxygen); pt (patient).

| Bene Initials | DOS | PAID | Hart to Heart Claim Diagnosis | Spangler Explanation for Medicare or Other Dispensation[1] |
|---|---|---|---|---|
| F.M.H. | 5/12/12 | $199.27 | FRACTURE OF UNSPECIFIED PART OF NECK OF FEMUR CLOSED | pt found in lounge chair at hospital assisted to stretcher at nursing home assisted to wheelchair billed fx hip , fall risk |
| S.L.M. | 5/7/12 | $209.67 | ACUTE BUT ILL-DEFINED CEREBROVASCULAR DISEASE | alisha billed claim to medicare on 5/10/12 on 5/23/12 I submitted to peninsula regional for payment per upper managements notes medicare was not refunded looks like patients choice is why hospital was billed |
| N.N. | 5/12/11 | $175.76 | BED CONFINEMENT STATUS | dialysis pt crew documented pt transferred to chair  at residence billed bed confined, esrd, 02 dependent |
| G.A.T. | 5/20/12 | $399.15 | LACK OF COORDINATION | stated to debbie not to bill bed confined billed fall risk, debility , knee replacement |
| D.M.T. | 5/5/11 | $214.43 | RENAL DIALYSIS STATUS | dialysis pt crew documented pt in wheelchair at residence billed esrd, chf, stretcher |
| D.L.W. | 5/13/11 | $182.95 | RENAL DIALYSIS STATUS | dialysis pt crew documented pt in wheelchair at residence billed esrd, 02 dep, stretcher |

## C.    Hart to Heart's Medically Unnecessary Bayhealth Ambulance Transports

118.    Bayhealth is the largest healthcare system in central and southern Delaware. Bayhealth is comprised of the former Kent General Hospital in Dover, Delaware, the former Milford Memorial Hospital in Milford, Delaware, a freestanding Emergency Department in Smyrna, Delaware, and numerous satellite facilities and employed physician practices encompassing various specialties.  During the Relevant Period, Bayhealth had a contract with Hart to Heart to provide ambulance transport services.

119.    The government's reviewer examined 136 of Hart to Heart's paid claims for BLS non-emergency transports using Hart to Heart's PCRs and the PCSs provided by the Bayhealth hospitals.  The review indicated that of the 136 claims, approximately 33% were not medically necessary.  Medical necessity could not be determined for approximately 44% of the remaining claims without additional medical records.

120.    Hart to Heart used vague, subjective, catchall diagnosis codes such as "lack of coordination" and "ataxia," which is another word for lack of muscle coordination, to explain the majority of these false claims.  Many of the diagnosis codes included on the Medicare claims submitted by Hart to Heart bore little or no relation to the patients' medical condition and diagnoses

referenced by the clinicians who signed the PCSs or the narratives completed by the Hart to Heart EMTs on the PCRs.

### D.    Claims Sample for May 1 and 2, 2012

121.    Pursuant to subpoena, Hart to Heart produced 100 claims for ambulance transport services on May 1 and May 2, 2012.  A review based on the PCSs and PCRs for those claims determined that approximately 59% of the transports were not medically necessary.  Medical necessity could not be determined for approximately 18% of the remaining claims without additional medical records.  Hart to Heart transported patients by ambulance whose vague diagnoses included "altered mental status," "unspecified debility," and the conclusory "bed confinement status."  Other diagnoses such as "above the knee amputation" do not necessitate ambulance transport if the beneficiary uses a wheelchair for mobility.  Again, many of the diagnosis codes included on the Medicare claims submitted by Hart to Heart appeared unrelated to the patients' medical condition and diagnoses referenced on the PCSs or the PCR narratives completed by the Hart to Heart EMTs.

### E.    Statistically Valid Random Sample

122.    From 2010 through 2017, Medicare paid Hart to Heart $32.9 million for Basic Life Support non-emergency transports, including mileage.  A substantial portion of these non-emergency BLS transports, $23 million, consisted of scheduled transports from hospitals to patients' residences, which included skilled nursing and assisted living facilities.

123.    Based on the substantial Medicare payment for non-emergency, scheduled hospital discharges, CMS contract statisticians created a statistically valid random sample ("SVRS") from the universe of these claims.

124.    A SVRS is a sample of randomly selected claims large enough that the characteristics of the sample should reliably reflect the characteristics of the larger universe of

claims.  In other words, the percent of medically unnecessary claims in the sample should be the same as the percent of medically unnecessary claims among all of Hart to Heart's submitted claims.

125.    The SVRS here was formed using random number selection.  This process identified 177 paid claims from a universe of 87,618 paid claims for non-emergency, scheduled BLS hospital discharges to patients' residences, including skilled nursing and assisted living facilities.

126.    The government's reviewer examined these 177 paid claims to determine whether medical necessity justified the transport or whether the payment was for a transport that was not medically necessary.  To determine medical necessity, the reviewer considered Hart to Heart's PCRs, the patients' PCSs provided to Hart to Heart by the discharging hospitals, and the patients' contemporaneous medical records obtained from third-party medical providers.

127.    The sample purposefully excluded claims already considered as part of the non-random claims analyses described in Sections IX.A through D, above.

128.    Based on its analysis of this information, government's reviewer determined that 55% of the ambulance transports in the sample were not medically necessary and were not supported by adequate medical documentation.

## X.    HART TO HEART'S KNOWING SUBMISSION OF FALSE CLAIMS

129.    Hart to Heart and EMS were well aware of the requirements under the Medicare regulations for submitting claims for ambulance transports.

130.    At the time that Hart to Heart and EMS requested Medicare reimbursement for many of its ambulance transports, it knew that it lacked sufficient documentation to establish the medical necessity or the transports.

131.    Beginning in at least March 2014, and continuing through at least June 2017 during the Government's investigation, Hart to Heart sent letters and emails to various Bayhealth employees requesting allegedly missing PCSs for previous transports, or demanding the creation or revision of PCSs for completed transports.  For many of these demands, Hart to Heart sought documentation to support medical necessity for ambulance transports that occurred, and that Medicare paid, months or years earlier.

132.    Hart to Heart and EMS's correspondence to Kent General Hospital, part of Bayhealth, on June 21, 2017 is just one example of its knowing state of mind while submitting false claims to Medicare.

133.    On June 21, 2017, after Hart to Heart became aware of the Government's investigation, a billing associate at EMS sent a letter to Kent General Hospital (the "June 21 Letter").  The letter explained that "Medicare requires a sufficiently completed PCS to bill patient transports."  The letter enclosed "missing/incomplete PCS resolution forms" for eighteen of Hart to Heart's ambulance transport patients and explained that the forms needed to be "completed/corrected as needed."  These "missing/incomplete" forms had all been completed and signed by hospital personnel on the date of transport, between two and six weeks prior to the June 21 Letter.

134.    Hart to Heart attached a cover letter to each PCS included with the June 21 Letter. These cover letters indicated the way in which Hart to Heart wanted the hospital to "complete[]" or "correct[]" the PCS.

135.    On most of these cover letters, Hart to Heart determined that the PCSs completed at the time of transport had "insufficient clinical documentation listed describing the patient's

medical condition at the time of transport that required the patient to be transported in an ambulance and why transport by other means was contraindicated."

136.    Representatives from Bayhealth confirmed to Government investigators that they did not provide any materials in response to Hart to Heart's June 21 Letter.

137.    EMS ultimately billed and received payment from Medicare for ten of the eighteen patients included in the June 21 Letter.  By Hart to Heart's own admission, eight of these transports were unsupported by the PCSs.  Examples of these fraudulent claims are as follows:

| Bene Initials | Date of Service | PCS Requested | Date  Medicare Received Claim | Medicare Processed Claim | Paid Amount |
|---|---|---|---|---|---|
| G.E.P. | 05/18/2017 | 6/21/2017 | 06/30/2017 | 07/14/2017 | $195.16 |
| G.S. | 05/22/2017 | 6/21/2017 | 07/07/2017 | 07/28/2017 | $190.41 |
| G.L.M. | 05/23/2017 | 6/21/2017 | 07/07/2017 | 08/18/2017 | $854.25 |
| P.A.D. | 05/24/2017 | 6/21/2017 | 07/10/2017 | 07/21/2017 | $298.04 |
| A.M.W. | 05/06/2017 | 6/21/2017 | 07/10/2017 | 07/21/2017 | $197.44 |
| K.W.C. | 05/22/2017 | 6/21/2017 | 07/10/2017 | 07/21/2017 | $231.73 |
| L.C. | 05/27/2017 | 6/21/2017 | 07/10/2017 | 07/21/2017 | $196.87 |
| J.L. | 06/02/2017 | 6/21/2017 | 07/10/2017 | 07/21/2017 | $283.75 |

138.    For all of these patients, Hart to Heart indicated that the PCSs had "insufficient clinical documentation" to establish the medical necessity of ambulance transport.  In sum, Hart to Heart knew that these patients did not meet medical necessity criteria for ambulance transport, yet still submitted Medicare claims for them.

### FIRST CAUSE OF ACTION
### (FCA: Presentment of False Claims)
### (31 U.S.C. § 3729(a)(1)(A))

139.    The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

140.    As more fully alleged in the above paragraphs, during the Relevant Period, Defendants knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval by submitting claims for BLS non-emergency ambulance transports to the Medicare program that were not medically necessary, and therefore ineligible for payment.

141.    As also more fully alleged in the above paragraphs, these claims were false because, among other reasons, they breached the certifications made to Medicare in Defendant Hart to Heart's Medicare Enrollment Application, the CMS-855B form, and the CMS 1500 forms Defendants presented in connection with those claims.

142.    By virtue of the false or fraudulent claims that Defendants knowingly presented or caused to be presented for payment or approval, the United States suffered damages and is entitled to treble damages under the FCA, in an amount to be determined at trial, plus civil penalties of not less than $5,500 or $10,957, and not more than $11,000 or $21,916 for each violation.

## SECOND CAUSE OF ACTION
### (FCA: Making and Using False Records and Statements to Get False Claims Paid)
### (31 U.S.C. § 3729(a)(1)(B))

143.    The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

144.    As more fully alleged in the above paragraphs, during the Relevant Period, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims that were paid by the United States for BLS non-emergency ambulance transports that were not medically necessary and therefore ineligible for payment.

145.    As also more fully alleged in the above paragraphs, the false records or statements Defendants made, used, or caused to be made or used, included PCRs and other pertinent records

relating to BLS non-emergency ambulance transports that were not medically necessary and for which Defendants sought and received reimbursement from Medicare.

146.    As also more fully alleged in the above paragraphs, Defendants made, used, or caused these false records or statements to be made or used, by, among other means, directing, coaching, inducing and/or instructing its employees and others, including staff at health care facilities, to falsify information in PCRs and other pertinent records, as well as to document information in those records regardless of the truth or falsity of that information.

147.    By virtue of the false records or statements that Defendants made, used, or caused to be made or used, the United States suffered damages and is entitled to treble damages under the FCA, in an amount to be determined at trial, plus civil penalties of not less than $5,500 or $10,957 and not more than $11,000 or $21,916 for each violation.

**THIRD CAUSE OF ACTION**
**(FCA: Conspiracy to Get False Claims Paid)**
**(31 U.S.C. § 3729(a)(1)(C))**

148.    The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

149.    As more fully alleged in the above paragraphs, during the Relevant Period, Defendants knowingly conspired to present or cause to be presented to the United States false or fraudulent claims for payment or approval.  Defendants further knowingly conspired to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims that were paid by the United States for BLS non-emergency ambulance transports that were not medically necessary and therefore ineligible for payment.

150.    By virtue of Defendants' conspiracy, the United States suffered damages and is entitled to treble damages under the FCA, in an amount to be determined at trial, plus civil penalties of not less than $5,500 or $10,957 and not more than $11,000 or $21,916 for each violation.

### FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

151.    The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

152.    The United States claims the recovery of all monies by which Defendants have been unjustly enriched.

153.    Because of the acts set forth above, Defendants were unjustly enriched at the expense of the United States in an amount to be determined at trial, which, under the circumstances, in equity and good conscience should be returned to the United States.

### FIFTH CAUSE OF ACTION
### (Payment by Mistake)

154.    The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

155.    The United States claims the recovery of all monies by which Defendant Hart to Heart has been paid by mistake.

156.    Because of the acts set forth above, Defendant Hart to Heart was paid by mistake at the expense of the United States in an amount to be determined at trial, which, under the circumstances, in equity and good conscience, should be returned to the United States.

### PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Defendants as follows:

A.     On the First Count under the FCA, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

B.     On the Second Count under the FCA, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

C.     On the Third Count under the FCA, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

D.     On the Fourth Count for unjust enrichment, for the damages sustained and/or amounts by which Defendants were unjustly enriched or by which Defendants retained illegally obtained monies, plus interest, costs and expenses, and for all such further relief as may be just and proper.

E.     On the Fifth Count for payment by mistake, for the damages sustained and/or amounts by which Defendant Hart to Heart was paid by mistake or by which Defendant Hart to Heart retained illegally obtained monies, plus interest, costs and expenses, and for all such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

Respectfully submitted,

ROBERT K. HUR
United States Attorney

/s/ Roann Nichols
Roann Nichols
Molissa H. Farber
Assistant United States Attorneys
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4800
Roann.Nichols@usdoj.gov
Molissa.Farber@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 30, 2018, I filed a true and accurate copy of the foregoing to using the Court's CM/ECF system, which will send an electronic notice of filing to all counsel of record.

/s/ Roann Nichols_____

Roann Nichols

Assistant United States Attorney